Good morning judges of the panel and alerted council. This particular case is an employment discrimination case involving an experienced legal secretary working for a well-known local law firm. You're Mr. Wooten, correct? I am Mr. Wooten. Excuse me, my name is Andre Wooten. I'm representing the plaintiff in this case, the plaintiff appellant in this case. It is certainly our argument that the visiting district judge erred when he granted summary judgment on all counts in this case, specifically the 1981 claim and the Title VII claim as well as the state anti-employment discrimination claim and a slander claim. We believe that the district judge erred by refusing to look at the pattern and practice of relegating this experienced litigation secretary in a permanent box reviewing and examining position. Let me ask you this. I think one of the things, I looked at the record and she was assigned to the bulky files reduction project. But my review of the record indicates that it was before she filed an internal grievance. If that's so, how could that assignment be in retaliation for her filing a grievance? Well, it's the fact that they would never let her out of it. She was hired as a litigation secretary. She applied for at least three openings and was denied and passed over for people with a lesser experience and qualification. But on the retaliation cause of action, I mean retaliation has to be in response to filing the grievance. How could that be in response? She was assigned to that previously. She wasn't assigned to it exclusively. Most all of the other secretaries in the whole firm were assigned to it. Every secretary did some of it. However, she was the only one assigned permanently to it and more specifically when she complained about a particular box containing sanitary napkins, garbage, roaches, and other garbage, she was reprimanded for that even though the supervisors refused to come down and actually look at the box. They complained about her accurately describing the materials that she found in this old storage box even though it is unrefuted that when she asked them to come and look at this, they refused to do so. Look at, we ask you to look at the declaration of another former coworker, Tina Leone. Tina Leone said that she was also assigned to the box review project along with a lot of other secretaries. And one day they opened a box which made a bunch of them sick. They complained about that and they were never assigned to do that again. Our position is that the plaintiff did make complaints about discriminatory treatment before she was given this assignment and only after making those complaints about discriminatory treatment in assignments when she was passed over three times for one particular position in July, August, and September of 2003. And she was relegated to this permanent box assignment even though none of the other experienced secretaries were placed in that position. Okay, just so that I can separate this out of my mind, summary judgment, you frame it by the pleadings, by the complaint. That's what, we have to look at the complaint and that's how we, and the question I have, you're using the word sort of loosely going from one, but you have a claim of discrimination, of racial discrimination, correct? Yes. All right. Does the complaint allege any incident of racial discrimination other than the comment that Ms. Diaz overheard in 2001? Yes, she does. Okay, in the complaint, that's what I want to know, in the complaint. The fact that she was passed over three times for people with lesser qualifications, in two cases people who were not even employees of the firm, who were hired just off the street, who theoretically would have been put into the Florida position that she was relegated to, or other positions, moreover, the attorneys that she was working for repeatedly asked for her to work on these complex asbestos cases. Asbestos litigation, as you know, is very complex and voluminous. She had experience, years of experience on working on those kinds of cases. She had 20 years of litigation secretarial experience at this time. Nevertheless, the firm was giving the jobs that she was applying to, to people who just graduated from secretarial school who had never actually filed a pleading in court. This person, Chris Tatum, that they gave that first job to on August 5, a job that she was working in, a job that she had requested to be placed in, had never filed anything in court. Did she apply for that job? Yes, she did. She applied using the office procedure, which is a phone call. There's a declaration of penal lioni again saying that if you're already an employee of the company, you didn't have to fill out a formal application. What's the evidence for the phone call? The evidence for the phone call is the plaintiff's statement and her declaration. Is that controverted? It is, and that makes it a material issue of fact. The email trail from later on in the month after the position had been filled suggests that the phone call was made the same day as the emails, which was after the position was filled. I would take some issue with that. The August 5 email was the first email that plaintiff received informing her that the position that she was working in was being filled by somebody else. And then on August 18, that person that they hired right off the street, they found out she couldn't do the job, and she was fired. And so that same position that she had been working in successfully, that the lawyers asked her to continue to work in, was filled by somebody else, somebody who still did not have the experience and professional qualifications that she did. We would ask the court also to look at the reprimands of the plaintiff that they're using to terminate her. Those things go to her free speech. They reprimanded her for calling the box assignment garbage. That's incorrect. She called one box to be full of garbage, and she asked them to come down and look at this box, and they refused to do so. That's unrefuted. That position became open a third time, because the second secretary that they hired to do that job still couldn't keep up and do the job. They passed over her again. And she was the only African-American person working in the whole firm and had been for five years. Furthermore, there were other jobs, litigation secretary jobs, one for Andy Pepper and one for another gentleman, jobs that they continued to hire people off of the street for, while claiming that they couldn't give her the job because they lost some attorneys and had to fill the positions that she applied for with these existing secretaries. At the time that she requested in February of 2004 to no longer be forced to do these box jobs, while she was a floater, and there's an e-mail of this, it indicates that a secretary was pregnant and was going on maternity leave. The floaters normally slide into those litigation positions to handle people who are taking leave. They hired another person fresh off the street to do the litigation position job while they were still relegating her to do this box cleanup job. And our argument is that relegating her to exclusively and only her continually to do the box cleanup job is evidence of a hostile work environment. If her employment qualifications were accurately and fairly assessed, she would have certainly been placed into the Tom Sylvester and Jennifer Vicente job, which she was working in successfully. There are no complaints about her performance or actual work performance in that job. And those attorneys were asking for her to continue to do those jobs after the other two or three secretaries were let go because they couldn't keep up. As late as December of 2004, Tom Sylvester and Jennifer Vicente were still giving her work in the asbestos litigation because the secretaries that Nancy Connelly and Leslie Yashimi had placed in those positions couldn't keep up. They couldn't do it. And there's a string of e-mails, I believe it's Exhibits 10 and 11, which concern that. We believe that the district judge totally failed to review the facts under the National Railroad case, refused to review the continuing pattern and practice of discrimination under the Lyons case, and refused to allow an examination of the actual qualifications of the secretaries that were given the positions that she had applied for. If there was a trial and she were allowed to challenge the qualifications of these people who were given the jobs over her, clearly we believe that a jury would have concluded that since she had 20 years of litigation experience and Chris Tatum had just graduated from secretarial school and had never filed a pleading in a court in her life, then clearly plaintiff was discriminated against because she was more qualified than the person hired for that position. And that happened time after time after time again. We really would ask the court to look at the last disciplinary allegations concerning the plaintiff because none of those actually go to her work performance. They go to her attitude. She said, gee, thank you for assigning me more box complaints or more box tasks. This was an e-mail in October. She didn't refuse to do it. She was perhaps a bit sarcastic about it, but she did it. We have established and presented into evidence lists of boxes that she created, lists of the contacts of the boxes that she created for months. She worked this assignment clearly from August of 2003 up until February of 2004 when she was terminated, when she asked to be assigned to actual secretarial work, when she learned that they had hired a secretary off of the street to fill in for the pregnant secretary that she as a floater would have normally slid into. And a couple other things before I run out of time. There's a slander and libel complaint in this complaint, and the district court judge dismissed it, we believe, erroneously. The slander incident arrives after she had been fired, and the declaration of Tina Leone lays this out specifically. In June of 2004, Leslie Ashimi, one of the people who had fired her, told a group of secretaries that when she fired the plaintiff, the plaintiff threw a cup of coffee onto litigation documents, thereby destroying company property. This was a lie. This was slanderous, and this allegation, because Honolulu is a relatively small town and secretaries tend to know each other, this slander spread around and it prevented plaintiffs from getting another permanent job for years. The statement is supported by Tina Leone's declaration, and it's unrefuted by the plaintiffs. Since that statement... Did Leone hear the statement? Yes, she did. Okay, it's still hearsay. She presented a declaration, basically sworn to tell the truth about what she heard, and she heard it with her own ears, and it wasn't reported to her. She was at work when this was said in a group of secretaries. It's hearsay. It still establishes a sufficient basis for the court to hear her slander complaint. Because it happened in June of 2004, it's clearly within the two-year statute of limitations for the amended complaint, which was filed in December of 2005. The court also, we believe, was clearly erroneous in dismissing the 1981 complaint because that has a four-year statute of limitations. And I'm running out of time, I think, so I'll try to reserve 10 seconds or something. Okay. Would you ever oppose the counsel? Thank you. Good morning. My name is Richard Rann, and I represent the defendants, Nancy Connolly, Carl Smith-Ball, and Leslie Hashimi. Needless to say, we disagree with Mr. Wooten, and we think the district court got it right in this case. It was right when it ruled the amended complaint did not relate back when it added two parties. It was correct when it found no evidence of a hostile work environment. It was correct in ruling that there was no retaliation after Ms. Diaz's internal complaint in October 2003. It was correct in ruling that her termination was for legitimate, non-discriminatory reasons. And it was also correct in resolution of her state tort claims. I was going to address the relation back argument, which Mr. Wooten did not, and maybe I'll just short-circuit that and say that the district court's analysis, I think, was entirely correct. It was also entirely consistent with circuit court law in this circuit about when you add new parties. What happened in this case, the original complaint was filed in September of 2005 and did not name Ms. Hashimi or Ms. Connolly. There was one reference to Ms. Connolly in the complaint. There was no dispute that Ms. Diaz knew who they were. There was no dispute she knew they were her supervisors. There was no dispute she knew of all the facts that related to them. In December of 2005, she filed a First Amendment complaint, having never served the original complaint. And we, of course, moved to say it did not relate back. And that was important because, as we talk about, there's some statute of limitations issues. But the district court was clearly correct on that because 15C does not save someone who simply makes a mistake. Well, and the district court found that her failure to name them was not a mistake concerning the identity of the proper party because she knew who they were. Right, and I think it's entirely consistent with case law. Well, the district court also said that more than 90 days had elapsed between the date of Diaz's right-to-sue letter, which was July 29, 2005, and the filing of her amended complaint, which was December 13, 2005. And Diaz's claims against Connolly and Nishimi were not timely and were properly dismissed. Right, and actually on the Title VII claim, I guess it's somewhat chicken and the egg because there's no individual liability against them anyway. So you could say the district court could have just said, look, there's no individual liability, I don't have to reach that. Or the district court could, as of what it did in this case, say, look, I don't have jurisdiction of a Title VII claim over them, so I'm not going to even reach the individual liability. It's also significant, Your Honor, because she had state claims, too. And the same analysis would apply under the state claims because the state right-to-sue letter was issued a few days later. And I think I calculated she had until the middle of November to file suit under state law for her state FEP claims. And again, since the amendment complaint didn't relate back, the district court correctly ruled that the individual defendants were entitled to summary judgment on that claim. So I think the district court was correct. The plaintiff did cite in his reply brief a case, Ortez v. Washington County. It's 88F3804, and I think they cited it for the proposition that there's individual liability. In that case, Judge Ridehart affirmed the basic principle that there is no individual liability under Title VII, but there could be liability in your official capacity, and we don't have that in this case. Let me talk about the application for the Tom Sylvester position, and let me lay out exactly what happened here. First, Ms. Diaz, at the time of this job, was a floater, and floating secretaries fill in for short vacancies. If you look at the declaration of Leslie Ashimi, which is part of Docket 42, the firm does not use floaters for long-term absences, such as pregnancies, because then it wouldn't have someone available on short notice. So floaters are used kind of on short and intermediate assignments. In July of 2000, first in June, she was assigned to Ms. Vincenti. Then in July 2003, that assignment was expanded to include Mr. Sylvester. And at the time, and that was July 19th, and at the time, Ms. Ashimi notified Ms. Diaz, we're looking for a secretary. We are looking for somebody for this position. Ms. Diaz testified that she knew that under Carl Smith's internal procedure, she don't have to file a new application. You call HR, and they internal contact the supervisor. She knew how to do it. She testified she had done it before. She also testified in her deposition, and the district court cited this, that when she was first assigned to Mr. Sylvester, she thought, I'm not really sure if I want this job. I know Tom, and I've worked with him before, but I'm not really sure if this is where I want to land. So she didn't apply. And so the firm was looking to fill the vacancy, and that's how Ms. Tatum got the position. On August 5th, Ms. Ashimi sent the email to everybody saying, we've hired Ms. Tatum. And I'm sure the court has seen this email exchange, which is very telling, because Ms. Diaz doesn't say, wait a minute, I applied, what happened? She says, oh, I assumed I'd have it, but, you know, I understand. And then Ms. Ashimi asked her on August 5th, are you interested in this position? And there was a long pause. There was a two-week pause. On August 18th, she says, I am still interested in this position. And Ms. Ashimi says, well, did you apply with HR? And she said, yes. So Ms. Ashimi calls Donna Takahashi, who submitted a declaration and says, yes, she called me on August 18th after the position had been filled. Now, throughout this case, we have always said to the – we argued to the district court, and we will point out again to this court, when did she apply if it was before August 18th? Where is the date in that record? Because if you look at the plaintiff's brief and her declaration, she says, well, about three weeks after I was assigned to that position, I applied for it. Well, if you take the three weeks from the date she was assigned to Attorney Sylvester, that puts her past August 5th. So we would submit that even looking at the facts and the inferences most favorable to Ms. Diaz, she has admitted she didn't apply for three weeks, which would be after that job was filled. We would also point out her deposition testimony, which is in the record, and the chronology she gave to the EEOC, which she handwrote on there, applied 8-18. And when I asked her no deposition, does that mean you applied on August 18th? She says, yes. Now I see the date. So there's no question she did not timely apply for that position, and she cannot establish her prima facie case. What happened after that is the firm had a little reduction, some attorneys left, so they displaced Ms. Tatum and they put in another secretary, Ms. Lagopan, who was more qualified and had been there longer, and the district judge found that was a legitimate reason. Subsequently, by the time of her evaluation in November, the firm had concluded that it would not place her on a permanent job until she showed better consistency and better work product. So the Tom Sylvester position, she didn't apply. She knew it was open, it was advertised in the firm's magazine, and she did not apply. So I think that the district court was entirely correct. There was a reference in the opening brief to the mixed motive analysis. It's sort of a belated claim that under COSTA that the plaintiff was entitled to a mixed motive analysis here. And we would submit that there is no evidence in this record, although it is far from clear from the decisions how much evidence you need to get a mixed motive analysis, there isn't anything in this record that would entitle the plaintiff to that. As the court has correctly noted, the only claim of a comment for the entire hostile work environment claim rests on one comment by a non-decision maker. That's not even a racial epithet. That's all you have in this entire record of someone who had been there four or five years. To get a mixed motive analysis, I think you need to come forward with some evidence that a jury could find that there was an impermissible motive, a dual motive, a good one and a bad one. You don't have that in this case. You have absolutely none of that in this case. The retaliation claim, I think the court has correctly noted that her assignment to this project occurred before her internal complaint. I think what is also significant is the concession this morning by counsel that everybody was assigned to this. This was a firm-wide project. So even if you were to find, well, there's an issue about when she was assigned, the fact is everybody had a chip into this project. And contrary to the assertions, this was not her only work. In fact, there's evidence in this record, and again, we would point to Clerk's Record 42, Ms. Hashimi's declaration, that she continued to receive a mix of assignments. And in fact, it was the change in that mix that ultimately led to her termination because in February when the firm told her, well, you don't have any float assignments for a while. It looks like you're going to be doing boxes and filing. That's when she said, that's all you got for me? Don't bother. And that's what led to her termination. The Tina Leone declaration has nothing to do with her. I guess I have a question about that. Does the record, when she said she asked to have time off without pay rather than filing more boxes, was she given the opportunity, could she have stayed on and worked full-time on the boxes or did they just fire her because she said that? They terminated her because they took that as saying, I'm refusing the work. And to put it in the context, in November she had had an evaluation. And in that evaluation, they had talked to her at great length about teamwork and not picking and choosing her assignments, which was one of her problems throughout her career. So if you read the evaluation, which is I think Exhibit L or N to Ms. Hashimi's declaration, they told her, you cannot pick and choose. In other words, if you're a floater, you can't say, well, I like working for you and I don't like working for you and I don't want to do this. So they had told her, look, you really need to shape up about this because you have to do what it takes to get the work done. So the firm's conclusion coming, what was it, three months after that evaluation, was that Ms. Diaz was essentially saying, well, if all you have is boxes, and the other part of it was filing, which clearly was part of her job, I'm not going to come to work. I'm not going to do it. And they, at that point, frankly, had just had enough. They had given her a lot of chances. They had moved her around in the firm. Her assignment to a floater position was really her last chance. When she got that in 2002, when she testified, I was happy, I was glad, I liked it, that was her last chance. When you say that to your bosses after they've told you in an evaluation, you really need to be a team player, you're essentially saying to them, I'm not going to be a team player, and that's why they terminated her. On the state, the slander claim, what happened in this case is when we filed our motion for summary judgment, we, of course, based it on what was on the complaint. And the amended complaint alleged, the only slanderous comment alleged in the amended complaint was during her evaluation in November of 2003, Ms. Connelly and Ms. Eshimi made up something false about her. So, of course, we moved for summary judgment and we argued that, hey, it's untimely because it's two years and it doesn't relate back and it's untimely as to them and it's not slanderous anyway because there's no publication. After we did that, they come in with the affidavit of Tina Leone, which is, I think, double hearsay. One employee told me that another employee said that Nancy Connelly said this after my termination. And I think the district court was correct in rejecting that because it was double hearsay. It may even have been triple hearsay. And it wasn't even alleged in the complaint. And as we argued in our brief, even if you were to consider it, it's not slander. Someone's saying, well, someone spilled coffee on a bunch of papers. That is not slander. Clearly not. Well, let's see. I'm not sure I understand the hearsay argument. Isn't that sort of the way slander works is people ruin your reputation? Right, but in this case, Your Honor, Tina Leone did not hear it. If you read Ms. Leone's affidavit or declaration, she was not there when Ms. Connelly said it. She said another employee told her, and I think it's two, it may be even two or three removed. So for the purposes of summary judgment, if you're going to create an issue of fact, normally I would agree with you it would be an admission or it would be a statement against interest. I'm sorry? I don't understand any of those statements or admissions. I'm just saying what's wrong with hearsay? Hearsay is not per se admissible. No, hearsay is not per se admissible. You keep distracting me. So you're not going to hear what I'm going to say. You're going to keep talking. That's okay. No, I'm done, Your Honor. Well, you think you know what I want to ask? No, I do not. Then why are you talking? I'm sorry, Your Honor. Hearsay is not admissible. There are many exceptions to hearsay rule. And certainly if you're going to allege defamation, one thing you have to prove is that this has been published to members of the community. And that's how it works. If you have the fact that somebody has heard the statement, it's far from irrelevant. It's the heart of a defamation claim. So I don't understand the hearsay argument. The hearsay argument came up, Your Honor, because we were on a motion for summary judgment and she was trying to create a disputed issue of fact. And in a motion for summary judgment, you don't allow hearsay to create disputed issues of fact. You can't come in with that. So where is it? I think we cited cases, Your Honor, in our brief on that. And I think that's pretty much the rule in this circuit. Isn't hearsay admissible in summary judgment just as it would be at trial? You can raise objection in summary judgment to evidence if these are the kinds of objections raised at trial. But if there would be evidence that would be admissible at trial, just saying hearsay doesn't get you there. I don't understand. She says, look, there's people in the community saying this about me. I have proof from another secretary that people are saying that I did X or I said X. What rule says that's an admissible? Well, Your Honor, I think in this case it wasn't admissible because, again, Ms. Leone did not hear it. And I think what Ms. Leone said in her declaration is that another employee told me that another employee had heard this conversation, which was allegedly between Nancy Connolly and one other person. So did we still? So here you are at trial. Actually, Your Honor is on the stand and she has asked this question. And you say objection, Your Honor. So go ahead, counsel. Make your objection as to why Ms. Leone should not be allowed to say this. Go ahead. What is your objection? My objection at trial would be that that would be double hearsay and that you need an exception for each element of hearsay. So hearsay can be admissible under certain circumstances. But if you're trying to prove that she spilled the coffee, you know, if you're trying to prove that she did what you said she did, but the proof here is not the content of the statement. The issue is, is this what's being said about her? Presumably falsely. I mean, I would assume that her position would be I never said any such thing. So the truth, you know, the statement is in fact false. And I'm not relying on the statement as being true. What I'm saying is this is what they're saying about me. This is what they're claiming about me falsely. So far from trying to prove the truth of the matter alleged, I'm in fact trying to show that people are talking about me falsely. So I don't know. If I were the trial judge, I would do a rule of objection unless you came up with something a little better. Well, I think you have to start back further at the source. And if the source denies it, then you can impeach. And then you move down the line. And then you create exceptions along those lines. And I think that you can do it. But I don't think you can start down at the bottom and have double levels where you don't start with an exception. Right. And another thing important to remember here is the allegation was not that Nancy Connolly was publishing this. It was other people, someone had heard it, and then that person was repeating it. So even if you assume, let's assume that this statement is admissible and should have been considered, it doesn't have liability for Ms. Connolly. The only allegation against her is she said it. Well, but if the statement is, you know, there are two people to this conversation, and I didn't say, I didn't tell anybody because I was so ashamed of this claim, the inference would be the only way a third party would have heard about this is if the other person to the conversation disclosed it. And I understand there were three parties to this conversation. Two of them were called misemployees, and one of them was the plaintiff. If I may, Your Honor, no, actually that's not correct at all. How many parties? Maya, and it's here somewhere, in her declaration, I believe Ms. Leone said that Nancy Connolly told another employee there were only two parties to the conversation. This was after Ms. Diaz had been terminated. Oh, no, she's talking about the original conversation. Yes. The one where plaintiff is alleged to have said something about the, that she considers, she considers that the claim that she said this was the crime authority. Actually, Your Honor, this claim is that after plaintiff was terminated, Nancy Connolly told, because it happened in 2004, June of 2004, Nancy Connolly told another employee that when plaintiff was terminated, she had spilled coffee on documents. That employee tells, the second employee, who then entails Ms. Leone. If you read Ms. Leone's declaration, that's how it, how it plays out. So it's an allegation of Nancy Connolly to employee one, employee one to employee two, and employee two to Tina Leone. So that, that was the basis of the slander claim, Your Honor. Well, it just, doesn't it matter what you're trying to prove? If you're trying to prove that she spilled coffee, then you've got levels of hearsay. If you're trying to prove that Connolly said this about her, then you've certainly cut out that he's one level of hearsay, right? Yes. And so what you're saying is you're complaining about the fact that instead of bringing in the intermediate employee, you're bringing in... Two removed, Your Honor. And we also noted in our brief, we don't consider that comment to be slanderous at all. Anyway, under Hawaii law, if you look at gold versus house. Well, that's a wholly different argument. So you're admitting the statement for purposes of the argument, you're saying even if said, it wasn't slanderous. Even assuming for the sake of argument it was said, it was not slanderous, yes. Why wouldn't a sort of anguished spilling of coffee, or slamming a coffee cup in an office situation, which shows an uncontrollable rage, be defamation under Hawaii defamation law? Well, the allegation was that she had actually just spilled coffee on documents. Because it wouldn't tend to injure her reputation. She wouldn't be able to show any damages or the fact that this comment... This was an accidental spill, or this was a deliberate spill, or this was an angry spill. It really depends on... There are many ways to spill coffee,  If she spilled coffee while trying to throw it in the face of the person she's confronting, then that would be certainly the kind of conduct that no employee would want to have said about her. If she took the coffee cup and she was holding it and slammed it down on documents, unmindful of the possibility of spilling or damaging documents, that would also not be the kind of thing that anybody would want to be said about their employee. Right? You wouldn't hire a secretary that you'd heard, when confronted in an office situation, had slammed a cup of coffee down on documents, damaging them, would you? I would hope not, Your Honor. But the statement of Ms. Leona's allegation actually was sort of non-pejorative. It was just that Nancy Connolly allegedly said that Ms. Diaz had spilled coffee on documents. There was no embellishment. There was no saying it was angrily or intentionally. It was just very... Literally, that's all she said. So we would submit to... As a matter of law, that would not be slanderous. Okay. Okay. Thank you. My time is up. Would you like to explain this, Roberto? If I may... The Tina Leone declaration is pages 104 and 105 of the plaintiff's appendix. And if I may read paragraph 4. And there's a typo in there, because it says June of 2003. It should be 2004, because she was still working in June of 2003. She says... Where are you reading from? Pardon? You're reading from which paragraph? Paragraph 4 of page 105. Okay, I got it. Go ahead. In June 2004, while working on a large Xerox project, Carl Smith employee Cynthia Ney stated that Nancy Connolly told her Anita Diaz had thrown coffee over Carl Smith's bald documents after being fired. At that time of Ms. Ney's statement, attorney Jennifer Lyons was present. I believe Ms. Leone was present also and heard that at the time. Wait, so Leone doesn't say how she knows this. This is a statement of fact about three people, none of which is the declarant. I conceive that the statement is brief, but Ms. Leone is... How does Ms. Leone know that Cynthia Ney stated that Nancy Connolly told her that Anita Diaz had thrown coffee? She describes the circumstances and she indicates that she was there at the time. What are the circumstances? I didn't see them. Well, while working on a large Xerox project, basically. Right. Cynthia Ney stated that Nancy Connolly told her that Anita Diaz... How does Tina Leone know that Cynthia Ney stated that Nancy Connolly told her Anita Diaz threw coffee? Tina Leone indicated that she was still working there and she was there at the time. Where does she say that? She told that to me. Okay, but it's not in the declaration. It's not in the declaration. Okay, so you're telling us, based on the information you have, that Tina Leone was present when Cynthia Ney said that Nancy Connolly told her that Anita Diaz had thrown coffee. That's how she knew. She heard it from Cynthia Ney. Okay, so Cynthia Ney said, Nancy Connolly told me that Anita Diaz had thrown coffee. That's pretty clearly hearsay, right? Essentially, yes. It's hearsay as to whether Nancy Connolly told her Anita Diaz threw coffee. So irrespective of whether the coffee was thrown at all, we don't care about the truthfulness of whether coffee was thrown. We only care about the truthfulness as to whether Nancy Connolly said Anita Diaz threw coffee. Right. The point is they were talking trash about her after she left, and it hurt her in terms of getting another job. I would also say that the August 18th email that has been mentioned is significant because that is when that job became open again. There's clear testimony that as of August 5th, Ms. Diaz was informed that somebody else had been given the job, but by August 18th, that person was fired and that job was open again, and they knew that she wanted the job and they refused to give it to her, not that time, but then again. Okay, thank you. Thank you. In case you're trying to withstand some of this, we are adjourned.
judges: Kozinski, Bybee, Callahan